HEARD APRIL TERM, 1874.

## STATE vs. CARDOZO, TREASURER.

A petition for a *mandamus* to compel a public officer to pay a claim held by the relator must describe the claim in such terms as to identify it and distinguish it from all other claims of a similar kind.

" Certificates of indebtedness," issued by the State Treasurer, under the directions of an Act of the Legislature, in payment of certain claims against the State, and redeemable by the Treasurer out of the taxes of a certain year, " or receivable in the payment of all taxes or other dues to the State," are not " bills of credit," within the sense of that term, as used in Article I, Section 10, of the Constitution of the United States.

A public officer is not liable to punishment for obeying an Act of the Legislature which violates no provision of the Constitution.

It is no violation of Section 10, Article IX, of the Constitution of the State, to issue " certificates of indebtedness " as evidence of debt due for the public printing and other claims against the State.

A claim against the State, ordered to be paid by the Legislature, cannot be questioned before the Courts upon grounds imputing wrong or improper motive to the Legislature.

These were ten petitions to the Supreme Court by as many different relators, praying for writs of *mandamus* against F. L. Cardozo, State Treasurer.

The relators were A. G. Brenizer, as Cashier and agent of the Central National Bank of Columbia, and as agent of the Trustees of the Citizens' Savings Bank, a bankrupt corporation, F. Cardarelli,

J. M. Smith, T. C. Andrews, J. A. Bowley, Howie & Allen, A. Palmer, W. E. Rose, P. F. Frazee, and Josephus Woodruff and A. O. Jones, members of a firm called the Republican Printing Company.

The petition of Brenizer set forth an Act of the General Assembly of the State, approved March 9, 1874, whereby it was enacted: "That the sum of sixty-five thousand dollars be, and the same is hereby, appropriated for the payment of pay certificates issued by the authority of the General Assembly, bills payable or Treasury notes of the late State Treasurer, Niles G. Parker, interest on loans, and other evidences of indebtedness held as claims by the Citizens' Savings Bank of South Carolina and the Central National Bank of Columbia against the State of South Carolina.

"SEC. 2. That the State Treasurer be, and he is hereby, directed and required, upon the presentation at his counter by A. G. Brenizer, Esq., Cashier, or his authorized agent, of the said claims of the said Citizens' Savings Bank of South Carolina, and Central National Bank of Columbia, to pay the same, with all lawful interest that may have accrued upon said claims: Provided, That the amount of said claims and interest shall not exceed the appropriation herein made.

"SEC. 3. That in case there is not sufficient money in the Treasury to pay said claims, or any part thereof, at the time of presentation, the State Treasurer is herein authorized and required to issue to A. G. Brenizer, Cashier, or his authorized agent, upon demand, certificates of indebtedness to the amount of said claim, which certificates shall be redeemed by the said Treasurer out of moneys collected from the taxes for the fiscal year commencing November, 1874, or receivable in payment for all taxes or other dues to the State for the said fiscal year, except taxes for school purposes, and interest on the public debt."

That the banks above named were the holders of the claims mentioned in said Act, and that the petitioner was the agent for the collection of the same.

The petitions of Cardarelli, Rose and Frazee set forth a Joint Resolution, approved March 9, 1874, whereby it was provided as follows: "That the sum of nineteen thousand dollars be, and the same is hereby, appropriated for the payment of pay certificates issued by the authority of the General Assembly, and bills payable or Treasury notes of the late State Treasurer, Niles G. Parker,

together with the interest on the said certificates and bills payable, at the rate of seven per cent. per annum, held as the claims of Phineas F. Frazee against the State of South Carolina, which have already been passed upon, but no appropriation made for the payment of by the General Assembly.

"That the sum of six thousand seven hundred and seventy-two dollars and eighty-six cents be, and the same is hereby, appropriated for the payment of a pay certificate, issued December 1, 1873, in favor of W. E. Rose, for claims passed by the General Assembly, held by him against the State of South Carolina, for which no appropriation was made to pay.

"That the sum of eleven hundred dollars be, and the same is hereby, appropriated to pay the pay certificates authorized by the General Assembly, and held by Felix Cardarelli as claims against the State of South Carolina, together with the interest on the said certificates at the rate of seven per cent. per annum.

"And the State Treasurer is hereby directed and required, upon the presentation, at his counter, by the said Phineas F. Frazee, W. E. Rose, Felix Cardarelli, or their authorized agents, of the said claims, to pay the same.

"And the State Treasurer shall, and he is hereby required, on the presentation of the aforesaid claims, to issue to the said Phineas F. Frazee, W. E. Rose, Felix Cardarelli, or their authorized agents, upon their demand, certificates of indebtedness to the amount of their several claims, which certificates shall be redeemed by the said Treasurer out of moneys collected from the taxes collected for the fiscal year commencing November 1, 1874, or receivable in payment of all taxes or other dues to the State for the said fiscal year, except for the payment of the interest on the public debt, or the tax levied for the support of schools."

In the petition of Frazee the Act approved January 9, 1874, referred to in the opinion of the Court, in which some of his claims were specifically mentioned, was not referred to.

The petition of Smith set forth:

"That your relator is the *bona fide* owner and holder of various different legislative pay certificates, issued in pursuance of law, amounting, in the aggregate, to the sum of nineteen hundred dollars, and for the payment of which provision has been made by the General Assembly, by Act approved March 17, 1874, as follows, to wit:

"An Act to Amend an Act entitled 'An Act to make Appropriation to Meet the Ordinary Expenses of the State Government for the Fiscal Year commencing November 1, 1873,' approved March 9, 1874.

"*Be it enacted* by the Senate and House of Representatives of the State of South Carolina, now met and sitting in General Assembly, and by the authority of the same, That sub-division six of Section three (3) of an Act entitled 'An Act to make appropriations to meet the ordinary expenses of the State government for the fiscal year commencing November 1, 1873,' approved March 9, 1874, be, and the same is hereby, amended so as to read as follows : 'If the proceeds of the tax levied for the payment of the expenses of the General Assembly shall be insufficient to pay in full the appropriations herein made, the State Treasurer is directed, after paying the salaries and mileage of the members, to pay the salaries and per diem of the officers, Engrossing Clerks, Solicitors, and then the employees of the General Assembly, prior to any claim for contingent or incidental expenses whatsoever, and to divide the remainder between the House and Senate orders ; and then, in case there is a deficiency in the appropriations made for legislative expenses and printing in said Act, the State Treasurer is hereby authorized and directed to issue certificates of indebtedness to the amount of said deficiencies for the payment thereof, to be redeemed out of the taxes collected for the fiscal year commencing November 1, 1874, as provided for in an Act entitled 'An Act to raise supplies for the fiscal year commencing November 1, 1873, and to alter and amend the law in relation to the collection of taxes,' approved December 22, 1873."

The petition of Bowley was the same, in every respect, as that of Smith, except as to the amount of the claim.

The petitions of Andrews, Howie & Allen and Palmer, set forth a Joint Resolution, approved March 16, 1874, whereby it was provided "that the sum of eleven thousand nine hundred and six dollars and fifty-six cents, ($11,906.56,) or so much thereof as may be necessary, be, and the same is hereby, appropriated for the payment of the claims owned and held by M. H. Berry and others, as follows: Legislative pay certificates for the years 1871, 1872 and 1873, amounting to the sum of $11,906.56; the sum of three thousand and eleven dollars and fifty cents is also appropriated

for the payment of the claim of the Aiken Tribune, passed by the two Houses of the General Assembly at the present session; also the sum of twelve thousand dollars, for the payment of the claims of George Symmers; also the sum of six thousand two hundred and eighty dollars, for the payment of the claims of A. Palmer; also the sum of twenty-nine hundred and twenty-three dollars, for the payment of the claim of the Beaufort Southern Standard; also the sum of two thousand three hundred dollars, for the payment of the claim of the Columbia Union-Herald; also the sum of five thousand four hundred dollars, for the payment of the claims of the Charleston Chronicle; also the sum of six thousand two hundred and ten dollars and thirty-three cents, for the payment of the claims of Howie & Allen; also the sum of seven thousand seven hundred and forty-seven dollars, for the payment of the claim of J. Evans Britton.

"SEC. 2. That the State Treasurer be, and he is hereby, authorized and required, upon presentation of the aforesaid legislative pay certificates, as provided for in Section 1 of this Joint Resolution, to issue to the said M. H. Berry, and others, certificates of indebtedness to the amount of the above appropriations, in such sums as he, or they, the said M. H. Berry and others, may desire; said certificates to be redeemed out of any incoming taxes paid into the State Treasury for the fiscal year commencing November 1, 1874; and the State Treasurer is further authorized and directed to issue to Henry Sparnick certificates of indebtedness in the sum of three thousand and eleven dollars and fifty cents, in payment of the claim of the Aiken Tribune, passed by the General Assembly at the present session, said certificates to be redeemed out of any incoming taxes paid into the State Treasury for the fiscal year commencing November 1, 1874."

The petition of Andrews alleged that he was the owner of the claim for $2,300 mentioned in the resolution as the claim of the Columbia Union-Herald.

The petition of Woodruff and Jones, members of the Republican Printing Company, set forth "An Act to make appropriations to meet the ordinary expenses of the State Government for the fiscal year commencing November 1, 1873," approved March 9, 1874, which contained the following amongst other appropriations:

"SEC. 3. SUB. 5. For the payment of expenses of current print-

ing, twenty-five thousand dollars is hereby appropriated, to be paid on the order of the Clerks of the two Houses."

"SEC. 51. For the payment of the balance due the Republican Printing Company, on contract for current and permanent printing of the present session of the General Assembly, fifty-four thousand dollars, to be paid in accordance with the provisions of the Act under which said contract was awarded to said company."

This petition also set forth an Act approved March 17, 1874, which is as follows:

"AN ACT TO AMEND AN ACT ENTITLED 'AN ACT TO MAKE APPROPRIATION TO MEET THE ORDINARY EXPENSES OF THE STATE GOVERNMENT FOR THE FISCAL YEAR COMMENCING NOVEMBER 1, 1873,' APPROVED MARCH 9, 1874.

"*Be it enacted* by the Senate and House of Representatives of the State of South Carolina, now met and sitting in General Assembly, and by the authority of the same, That sub-division six of Section three (3) of an Act entitled 'An Act to make appropriation to meet the ordinary expenses of the State Government for the fiscal year commencing November 1, 1873,' approved March 9, 1874, be, and the same is hereby, amended so as to read as follows: 'If the proceeds of the tax levied for the payment of the expenses of the General Assembly shall be insufficient to pay in full the appropriations herein made, the State Treasurer is directed, after paying the salaries and mileage of the members, to pay the salaries and per diem of the officers, Engrossing Clerks, Solicitors, and then the employees of the General Assembly, prior to any claim for contingent or incidental expenses whatsoever, and to divide the remainder between the House and Senate orders, and then, in case there is a deficiency in the appropriations made for legislative expenses and printing in said Act, the State Treasurer is hereby authorized and directed to issue certificates of indebtedness to the amount of said deficiencies for the payment thereof, to be redeemed out of the taxes collected for the fiscal year commencing November 1, 1874, as provided for in an Act entitled 'An Act to raise supplies for the fiscal year commencing November 1, 1873, and to alter and amend the law in relation to the collection of taxes,' approved December 22, 1873."

The petition also set forth "An Act to make appropriation for the payment of the expenses of printing," approved November 19,

1873, which, after various appropriations for printing, amounting to $125,000, contained the following :

" SEC. 4. That the State Treasurer be, and he is hereby, authorized and directed to issue to the Republican Printing Company certificates of indebtedness to the amount of the above appropriations, and also for the balance due said company, one hundred thousand five hundred and eighty-nine dollars sixty-three cents, with interest, appropriated by the General Assembly for printing at the session of 1872–73.

" SEC. 5. That the sums hereby appropriated be paid on the certificates of the Clerks of the two Houses, said certificates of indebtedness to be receivable in payment of all dues to the State, and redeemable at the State Treasury out of the incoming taxes, except taxes levied for school purposes and interest on the public debt."

It also contained " An Act to raise supplies for the fiscal year commencing November 1, 1873, and to alter and amend the law in relation to the collection of taxes," approved December 22, 1873, which contained the following :

" SEC. 5. That a tax of one mill upon every dollar of the value of all taxable property in this State be, and the same is hereby, levied to meet appropriations for public printing for the fiscal year commencing November 1, 1873.

" SEC. 11. That all taxes assessed and payable under this Act shall be paid in the following kind of funds : United States currency, gold and silver coin, National Bank notes, and certificates of indebtedness authorized by this General Assembly and issued to the Republican Printing Company, pursuant to the Act approved November 19, 1873 ; and on receiving any of said certificates for taxes, the County Treasurers shall cancel the same, by writing the word ' Cancelled ' on the back of each certificate so received, and attaching his official signature thereto ; and the State Treasurer shall report to the General Assembly, at the next regular session, the total amount of such certificates returned to him by the County Treasurers respectively."

All the petitions set forth the 7th Section of " An Act to raise supplies for the fiscal year commencing November 1, 1874," approved March 14, 1874, which is as follows :

" SEC. 7. That a tax of one and four-fifths of a mill upon every dollar of the value of all taxable property in this State be, and

the same is hereby, levied to pay the deficiency or the unpaid appropriations and claims of the Central National Bank, P. F. Frazee, F. Cardarelli and others, made by the General Assembly, for the fiscal year which commences November 1, 1873."

The relator in each case alleged that he presented his claim at the counter of the Treasurer and requested him to pay the same, or to issue to the relator the certificates of indebtedness authorized and required to be issued, &c., but that the State Treasurer refused to pay the claim in money, or to issue the certificates of indebtedness, and prayed that the said F. L. Cardozo, State Treasurer, may be required and commanded to pay to the relator his said claim or to issue to him the said certificates of indebtedness.

A rule to show cause why a peremptory *mandamus* should not be granted was issued in each case, and a return thereto duly filed.

To the petition of Brenizer the return showed, for cause, as follows :

I. That the said *mandamus* should not be granted to require this respondent to pay the claims of the said relator, as agent, because this respondent now shows and informs this Honorable Court that there is no fund or moneys which this respondent is by law authorized or required to pay to the said relator in payment or satisfaction of said claims, as set forth in the petition herein.

II. That the said *mandamus* should not be granted to require this respondent to issue certificates of indebtedness in payment or satisfaction of said claims of said relator :

(1) Because said certificates of indebtedness, when issued, would be and become "bills of credit" of the State of South Carolina, and would be within the prohibition of the tenth Section of Article I of the Constitution of the United States; and,

(2) Because the sole fund or moneys out of which the said claims of the said relator are or will be payable, if said claims are or will be lawfully payable in any manner, will arise under the provisions of the Act of the General Assembly entitled "An Act to raise supplies for the fiscal year commencing November 1, 1874," and by the provisions of the Act of the General Assembly set forth in the petition herein, and entitled "An Act to make appropriation to pay the claims of the Citizens' Savings Bank of South Carolina, and the Central National Bank of Columbia, S. C., against the State of South Carolina," approved March 9, 1874, this respondent, as State Treasurer, is authorized and required, by Section 3 thereof,

to issue to the relator the said certificates of indebtedness only in case there is not sufficient money in the Treasury to pay said claims of said relator, or any part thereof; that it is not the right or duty of this respondent to issue said certificates until the tax levied to pay said claims of said relator shall have been collected into the Treasury, and there shall be an insufficient amount of money arising from said tax to pay the said claims of said relator.

III. That the said *mandamus* should not be granted to require this respondent to pay the said claims of the said relator, because if said *mandamus* should now be granted, and this respondent should presently pay said claims, then this respondent would be compelled to divert the funds arising under the provisions of the Act of the General Assembly entitled "An Act to raise supplies for the fiscal year commencing November 1, 1873, and to alter and amend the law in relation to the collection of taxes," approved December 22, 1873, from the specific purposes and objects therein named, contrary to the provisions and requirements of the fourth Section of Article IX of the Constitution of the State.

IV. That the said *mandamus* should not be granted to require this respondent to issue certificates of indebtedness for said claims of said relator, because, as is hereinbefore set forth, this respondent is by law authorized to issue said certificates of indebtedness only in case there is not sufficient money in the Treasury to pay said claims, or any part thereof; and if there is not now, nor has been at any time, any money whatever in the Treasury which is by law applicable to the payment of said claims of said relator, then the contingency upon the happening of which this respondent is authorized by law to issue certificates of indebtedness for said claims of said relator has not arisen.

V. For further cause why said *mandamus* should not be granted to require this respondent to pay said claims of said relator, or to issue certificates of indebtedness therefor, this respondent shows that the pay certificates and bills payable or Treasury notes set forth in the said Act entitled "An Act to make an appropriation to pay the claims of the Citizens' Savings Bank of South Carolina, and the Central National Bank of Columbia, S. C., against the State of South Carolina," approved March 9th, 1874, were issued without warrant of law, in excess of the lawful appropriation made for such purpose by the General Assembly, and were at all times, and now are, illegal, fraudulent and void, and wholly without consideration

in law, and this respondent cannot, in law or justice, be made the instrument by which to cause the payment of said claims out of the funds of the State, or by the issue of any obligations of the State; and for the proof of the facts stated in this paragraph, this respondent proffers to this Court the books and records of the office of this respondent, as State Treasurer.

VI. That said *mandamus* should not be granted to require this respondent to issue certificates of indebtedness for said claims of said relator, because if said certificates of indebtedness shall be issued they will become payable out of any of the taxes levied for the fiscal year commencing November 1, 1874, and will be receivable in payment of all dues to the State for the said fiscal year, except taxes for school purposes and interest on the public debt; and the said certificates of indebtedness will thereby be and become claims which will be paid in preference to all other claims or appropriations made by law payable out of the proceeds of the tax levied for said fiscal year, except the taxes levied for school purposes and interest on the public debt.

The return in each of the other cases was substantially the same—that in the case of Woodruff and Jones, containing some further objections, which will be sufficiently understood from the opinions of the Judges.

*Rion, Dunbar, Melton & Clark, Whipper,* for relators.

*Melton,* Attorney General, *Elliott, Chamberlain,* for respondent.

The opinion of the Court was delivered by

Moses, C. J., [who, after stating the names of the cases, proceeded as follows:]

The cases named were all heard together. Their general object was to compel the State Treasurer to issue to the several relators certificates of indebtedness for certain claims alleged in their respective suggestions to be held against the State, and for which, as they aver, provision for payment was made by the appropriation Acts specifically referred to ; and on failure of means through the Bills to raise supplies to meet the said claims, certificates of indebtedness for their several amounts were to be issued to the various parties by the said Treasurer. They set out a demand for payment, and in the event of there being no money in the Treasury properly applicable to them, then for the said certificates, which was refused.

The relators are to be distinguished into various classes—those who aver a right to the remedy sought by reason of appropriation to meet "pay certificates issued by authority of the General Assembly, bills payable or Treasury notes of the late State Treasurer, Niles G. Parker, interest on loans and other evidences of indebtedness," and those who merely assert a claim passed by the General Assembly without any express reference as to its character, but leaving, from the language of the appropriation for its payment, the necessary implication that it was founded on "legislative certificates."

The claim of the Republican Printing Company is of another character, and is alleged to be founded on an appropriation for public printing, in a fixed amount, as follows: By the fifth subdivision of Section 3 of appropriation Act to meet the ordinary expenses of the State Government for the fiscal year commencing November 1, 1873, (15 Stat., 614): "For the payment of expenses of current printing, twenty-five thousand dollars is hereby appropriated, to be paid on the order of the Clerks of the two Houses." By first sub-division of 5th Section of the same Act (same page): "For the payment of balance due the Republican Printing Company, on contract for current and permanent printing of the present session of the General Assembly, fifty-four thousand dollars, to be paid in accordance with the provisions of the Act under which said contract was awarded to the said company."

It also sets forth the "Act to raise supplies for the fiscal year commencing November 1, 1873," &c., by the 5th Section of which (15 Stat., 515,) "a tax of one mill upon every dollar of the value of all taxable property in this State be, and the same is hereby, levied to meet appropriations for public printing for the year commencing November 1, 1873."

It further sets forth the Act of March 17, 1874, "to amend an Act entitled an 'Act to make appropriations to meet the ordinary expenses of the Government for the fiscal year commencing November 1, 1873' (15 Stat., 709,) which provides that in case there is a deficiency in the appropriations made for legislative expenses and printing in said Act, the State Treasurer is hereby authorized and directed to issue certificates of indebtedness to the amount of said deficiency, for the payment thereof, to be redeemed out of the taxes collected for the fiscal year commencing November 1, 1873," &c. It alleges that their claim against the State arises out of a deficiency

in the appropriations made for legislative expenses and printing in the Act approved March 9, 1874 ; that they presented their claims at the counter of the Treasurer and requested him to pay them, or issue to them the certificates of indebtedness authorized and required to be paid by the provision of the Act already referred to, which was refused.

The writ of *mandamus* cannot issue to enforce the performance of what is claimed as a right against a public officer, unless the nature and character of the right be first shown, so that the Court may determine whether it raises a corresponding duty on the part of the officer. Where a claim is directed by the Legislature to be paid, and is so set forth that the Treasurer may identify it by the enactment, through the force of which it is demanded, he may not be at liberty to exercise any discretion in the obligation which is imposed upon him, either to pay it or place it in such form as the Legislature has directed, provided it involves nothing inconsistent with the Constitution of the State or the United States. The mere allegation by a relator that an appropriation has been made for the payment of pay certificates issued by the authority of the General Assembly, and held by him, will not necessarily entitle him to the aid of the Court, through the writ of *mandamus,* to enforce the payment, unless in his suggestion such a description is given as will be sufficient to identify them, that the Court, if it responds favorably, may frame its order in such language as to make it available and effective for the purpose it designed. Nor can the Court properly act unless the instruments on which the claim is alleged to rest are so set forth that they may be distinguished and set apart from all others of the like kind. There is wanting in the suggestions such a specific statement of the claims as is necessary to guide and regulate the judgment of the Court in its order to the Treasurer. In fact, without it the order might be fruitless, from the general character of its terms. The mandatory clause of the writ should be expressed with certainty, that the party to whom it is addressed should not have the chance of disobeying it for any want of distinctness or precision. The only cases where the claims depend upon pay certificates, or bills payable, or Treasury notes of the late State Treasurer not subject to this objection, are those of Frazee and Rose, except in the case of the former as. to the pay certificates referred to in his suggestion. The Act of February 6, 1874, (15 Stat., 532,) audits the other demands presented by him to

the General Assembly, setting them forth fully. That of Rose is expressed in the Act to be for claims passed by the Legislature, and the amount included in one pay certificate, of which the date and sum are both given. They are thus identified, and can be the subject of a direct and specific order.

The case of the Republican Printing Company stands on a different footing. Their claim is for labor and services performed for the State, through the direction and employment of the Legislature, and appropriations, definite and fixed, are made for the payment. The amount does not depend on the certificates of the Clerks of the two Houses, as was said, but are named in and determined by the Acts which have been already referred to. There is nothing in the return of respondent which contests the validity of the claim, so far as it is averred to be in consideration of services performed, for which the State is responsible. All the objections rest upon the want of power in the General Assembly to make the said appropriations the subject-matter for the issuing of a certificate of indebtedness, either for the repugnancy to the Constitution of the State or the United States, or as being repugnant to or inconsistent with existing laws. The first objection is, that the certificates of indebtedness now demanded are " 'bills of credit,' within the meaning of the Constitution of the United States." The subject has been so lately and fully considered by the Court, in *Shiver* vs. *Hoge*, May Term, 1873, that it is not our purpose now to enlarge upon it. As was there said, the fact that the debt or obligation of a State might be readily received in the community in the payment of debts or purchase of commodities might not so impress the paper with the qualities which would render it obnoxious to the Constitution, for it is the intention to create a currency—a circulating medium—which invalidates the emission, and this must be apparent from the whole scope of the Act. That some of the said certificates of indebtednes were to be receivable in taxes due the State affords no evidence of an intention on the part of the Legislature to create a currency or circulating medium. It was but a ready and legitimate mode of their payment or redemption, and exhibits no purpose of creating a medium by which the volume of circulation might be so increased as to produce all the evils of a redundant and excessive currency. There is no intent to do more than to provide for the creditors, to whom the indebtedness of the State was admitted, the means of making their debts available in the payment of taxes,

or even other dues to the State, provided there should be a deficiency in the supplies to meet the various appropriations they were expected to pay. The certificates in no way increased the obligation of the State, and, in fact, only constituted another admission by the General Assembly of the particular debt not paid by the certificate, but remaining due until its satisfaction was unconditionally acknowledged.

It is, secondly, shown, for cause, why the writ prayed by said company should not issue, that the taxes authorized to be levied under "the Act to raise supplies for the fiscal year commencing November 1, 1874," are, when collected, appropriated and devoted to certain named and specified objects—are to be kept separate and apart from each other, and to be applied to the purposes for which they are levied, and none other, and any failure to comply with its requisitions would subject the respondent to punishment by fine and imprisonment. It is enough, in reply to this objection, to say that the very Act levies a tax to meet the appropriations for the public printing for the fiscal year, November 1, 1874, and it is to be presumed that the Legislature knew the amount that would be required to pay the sum which they had set apart for this purpose. Besides, a right conferred by statute is not to be postponed in its enjoyment because some future exigency might arise which would render its exercise inconvenient or impracticable. But even if subsequent developments should show that by some contingency the appropriated amount might not be raised, and by possibility the Treasurer should discover that he could not conform to the very letter of the Act of March 9, 1874, the objection could not be urged against the issuing of the certificates, but against their redemption.

In any event, if the act of the officer is compelled by a subsequent statute, he would scarcely be liable to punishment, because, perchance, it may violate some previous one, and he would even be protected if his act was induced by some Section of the same statute. A public officer cannot be amenable to punishment by following the directions of the Legislature—certainly when they involve no constitutional breach.

The only remaining objection in the return of the respondent to the suggestion of the said company is the third, that the issue of the certificates to the relators will be a violation of Section 10, Article IX, of the Constitution, which is in the following words : " No scrip, certificates, or other evidence of State indebtedness,

shall be issued, except for the redemption of stock, bonds or other evidences of indebtedness previously issued, or for such debts as are expressly authorized in this Constitution." It is enough to say that the public printing, being one among the necessary expenses of the State, is a debt " authorized by the Constitution." The 3d Section of the 9th Article of that instrument requires that " the General Assembly shall provide for an annual tax sufficient to defray the estimated expenses of the State for each year." Besides, an appropriation is an evidence of indebtedness by the State, and for this the certificates are claimed. No allegation is made that the debt for printing was not a *bona fide* claim against the Legislature, even if such question could have been raised here. And if the fact had been, as was intimated, that the amount due to the company was ascertained by the Clerks of the two Houses and certified by them, they being the representatives of the company, it is not clear that this or any other Court would be authorized to inquire into the policy, wisdom, justice or prudence of the enactment, and test its validity by either of the said standards. It is a mistake, however, to say that the amount due to the company, under the Acts through which they here claim, were to be regarded and adjusted by the certificates of the two Clerks, who were members of the Republican Printing Company. The two Clerks were not referred to in either of the Acts before us, except that in sub-division 5 of Section 3 of Act of March 9, 1874, the amount there appropriated was " to be paid on the order of the Clerks of the two Houses."

It was a mere authority to receipt and thus discharge. We fail to discern any application of 4th Section of 9th Article of the Constitution of the State, which is interposed as a bar by the respondent.

The Acts and Joint Resolutions are laws, and they provide for the levy of the tax, and its object is distinctly stated. There does appear to be a full compliance with all that is demanded by this constitutional requirement.

We have thus considered all the objections urged by the return to the rule to shew cause in the case of the Printing Company. Some of them apply to the cases made by the other relators ; and as to these last, there are further exceptions not made to the claim of the said company, which we will now briefly consider.

The objection of the respondent that the certificates cannot be issued until the taxes for 1874 are collected cannot avail.  By the Act and Joint Resolution they are redeemable out of money collected from the taxes of said year, and some of them receivable in payment of such taxes.  This clearly shows that they are to be previously issued.

For further cause why the said *mandamus* should not be granted, as prayed by the said Rose and Frazee, severally, it is objected that the legislative pay certificates, treasury notes, for and in consideration of which the appropriations were made in favor of the said Rose and Frazee, respectively, were issued without warrant of law, in excess of the lawful appropriation made, and were, and now are, illegal, fraudulent and void.  So far as this position involves constitutional prohibitions, they have been considered and disposed of.  So far as it implies any wrong or improper motive on the part of the Legislature in the particular enactment, it is beyond the control of the judicial department.  It cannot examine into the inducements to any act.  Public and proper motives are alone to be attributed to the Legislature.  Can we direct an issue to test the motive which impelled its action, or to ascertain the consideration for claims which they have decided to be valid and ordered to be paid?  While they act within their constitutional limits they are beyond the control or supervision of the Judiciary.—Cooley on Constitutional Lim., pp. 186, 187, and authorities there cited.

Not only has an appropriation been made for their payment, but the means of meeting it, through a tax, have been provided. If, when payment is demanded, there are no funds to apply to it, the Treasurer is ordered to issue certificates of indebtedness, which are to be redeemable out of the taxes for the fiscal year commencing on 1st November, 1874, or receivable for taxes for the said year, or other dues.  " No executive duty is imposed on him—there is no reason for the exercise of discretion, official or otherwise—all that is shut out by the direct and positive command of the law, and the act required is, in every sense, a mere ministerial act."—*Kendell* vs. *The United States*, 12 Peters.

It is ordered that the petitioners in the several cases—Brenizer, Cardarelli, Smith, Andrews, Bowley, Howie & Allen, and Palmer— be dismissed without prejudice.

*1he State Ex Relatione W. E. Rose* vs. *F. L. Cardozo, State Treasurer :*

It is ordered, in this case, that a writ of *mandamus* do issue to the said F. L. Cardozo, State Treasurer, commanding and enjoining him, upon the receipt thereof, on the presentment at his counter by the said W. E. Rose, or his authorized agent, of the pay certificate issued December 1, 1873, in his favor, for the sum of six thousand seven hundred and seventy-two dollars and eighty-six cents, referred to in his petition, to issue to the said W. E. Rose, or such agent, certificates of indebtedness to the said amount, being the same amount appropriated by the Joint Resolution of the General Assembly, approved March 9, 1874, entitled " A Joint Resolution to make appropriations to pay certain claims, and for other purposes."

*The State Ex Relatione P. F. Frazee* vs. *F. L. Cardozo, State Treasurer :*

It is ordered, in this case, that a writ of *mandamus* do issue to the said F. L. Cardozo, State Treasurer, commanding and enjoining him, upon receipt thereof, on the presentment at his counter by the said P. F. Frazee, or his authorized agent, of the following claims, to wit: One bill payable or certificate of the late State Treasurer, No. 1, bearing date March 13, 1872, for twenty-five hundred dollars; one bill payable or certificate of the late State Treasurer, No. 9, bearing date March 14, 1872, for twenty-five hundred and seventy-three dollars and four cents; one bill payable or certificate of the late State Treasurer, No. 27, bearing date March 18, 1872, for five thousand and forty-one dollars and sixty cents; one bill payable or certificate of the late State Treasurer, No. 27¾, bearing date March 18, 1872, for six thousand dollars, issued on the above dates, for the sum, in whole, of sixteen thousand one hundred and fourteen dollars and sixty-four cents, and held by the said P. F. Frazee, as set out in the Act approved January 9, 1874, entitled "An Act to provide for the payment of the claims herein named," (15 Stat., 532,) to issue to the said relator, or his authorized agent, certificates of indebtedness to the amount of said specified bills payable or certificates of the late State Treasurer, and all lawful interest that may have accrued upon the same, as provided by Joint Resolution of March 9, 1874, (15 Stat., 808). This order not to prejudice hereafter any claim of the said relator for the payment of the legis-

lative pay certificates referred to in the said Act and Joint Resolution.

*The State Ex Relatione The Republican Printing Company vs. F. L. Cardozo, State Treasurer:*

In this case it is ordered that a writ of *mandamus* do issue to the said F. L. Cardozo, State Treasurer, commanding and enjoining him, upon the receipt thereof, on the presentation at his counter of the order of the Clerks of the two Houses of the General Assembly, by the said relators, to issue to them, or their authorized agents, certificates of indebtedness for the sum of twenty-five thousand dollars, appropriated by the fourth Section of the Act of March 9, 1874, entitled "An Act to make appropriations to meet the ordinary expenses of the State Government for the fiscal year commencing November 1, 1873." And it is further ordered that, on demand of the said relators, or their authorized agent, at the counter of the said State Treasurer, he do issue to them certificates of indebtedness to the amount of fifty-four thousand dollars, the amount appropriated to the relators under the fifth Section of the Act above referred to.

*Wright,* A. J., concurred.

WILLARD, A. J., [who, after naming the cases of Brenizer, Cardarelli, Smith, Andrews, Bowley, Howie & Allen, Palmer, and Woodruff & Jones, proceeded as follows:]

The relators in the above entitled cases have presented petitions alleging that they are the holders and owners of certain claims against the State, authenticated by certificates duly issued by certain officers of the State authorized to issue such certificates, and asking that a writ of *mandamus* may issue in each case to compel the performance of certain official acts by the State Treasurer, required to be performed by the provisions of certain Acts of the Legislature, spread out in the various petitions, looking to the payment of such claims directly, or for placing in the hands of the claimants certificates of indebtedness for the amount of such claims, which the relators claim will be of value to them, and, therefore, that they have an interest in and right to require performance of such act.

In each of the cases above entitled the relators claim to hold several certificates or other claims of the various classes described

in the several Acts, but they do not set forth the particulars of their claim in any manner by-which the certificates or other claims held by them can be identified.

The only claims described in these various Acts, so as to be capable of identification, are those to which the petitions of W. E. Rose and P. F. Frazee relate. In those cases the Act refers to certificates by date or number, so as to fix their identity sufficiently. In all the other cases the individual claims and certificates are not described by the Acts, nor any means of specific identification afforded.

It would, therefore, be necessary for the State Treasurer, upon the presentation of the various claims and certificates, to ascertain whether they were signed by the proper parties having authority to issue them, and whether they were issued conformably to law.

The relators ask of us compulsory process against the Treasurer. It is necessary, therefore, that the specific claims and certificates should be set forth in the suggestion, to enable the respondent to traverse any matter that may be of importance as it regards the right of the relators to the remedy demanded.

It has been contended that it is sufficient for the relators to demand a general direction, leaving it to the Treasurer to examine the vouchers on presentation after a general direction has been given to him as to the nature of his duty.

It is not the duty of the Court, nor the particular office of the writ of *mandamus,* to give general instruction, or to decide abstract questions touching the performance of official duties. This proposition was very clearly advanced in the *State Ex Rel. Morton* vs. *Hoge,* decided in September, 1873.

If the relators are entitled to any remedy, the nature and validity of their claims must be passed upon by this Court after an opportunity to contest their validity has been afforded to the respondent.

The duty that may be compelled by *mandamus* is specific; a general duty cannot be compelled in a case where private rights and interests are alone concerned. The suggestions do not contain matter sufficient to raise all the issues that the respondent is entitled to raise.

The propriety of requiring a specification of the details of the several claims, in respect of which the relators demand the aid of this Court, is peculiarly illustrated by the matters set forth in the petition of J. Woodruff and A. O. Jones and others. The peti-

tion in that case sets forth various legislative proceedings, relating to the employment of the Republican Printing Company, and providing for the payment of the amounts due to that company. The authority to ascertain and certify the amounts due to that company is conferred upon the Clerks of the two Houses of the General Assembly. The relators, J. Woodruff and A. O. Jones, were the Clerks of the respective Houses, upon whom the authority in question was conferred. These relators describe themselves, in their petition, as " trading under the firm name of the Republican Printing Company." They are, therefore, before us as parties preferring claims to a large amount, authenticated by their own signatures, as Clerks of the respective Houses of the General Assembly.

What may be the effect of the attempt to exercise public authority of this character, for their personal benefit, is a matter not presented for consideration at the present time ; but it is clear that the circumstances of this case illustrate most forcibly the propriety and necessity of their setting forth the prices and specific character of their claims, so that their legality may be tested, and the correct bearing of the Acts of the Legislature in question upon them may be ascertained.

For aught that the record discloses, these last named parties may hold a class of claims, the payment of which, by the Legislature, was not intended, and also claims that were intended to be provided for. The respondent has a right to know the precise nature of their claims, in order to direct payment according to the expressed intent of the Legislature; and the Court, before it can assume to direct the action of the Treasurer, must possess the same knowledge.

The petitioners in each of the above entitled cases should be dismissed without prejudice.

[Then stating the title of the case of Rose, he continued :]

The respondent has traversed the validity of the claim set forth by the relator, as the ground of asking relief by *mandamus.* The averment of the return is that the evidences of debt relied upon by the relator " were issued without warrant of law, in excess of the lawful appropriations made for such purposes by the General Assembly, and were at all times, and now are, illegal, fraudulent and void, and wholly without consideration in law, and this respondent cannot, in law or justice, be made the instrument by which to cause the payment of said claims out of the funds of the State, or by the issue of any obligations of the State."

If, then, the legal validity of the claim presented by the relator can be inquired into in these proceedings, the traverse of the return puts such legal validity at issue. No objection is made by the relator to the return upon the ground that the issue thus tendered lacks formality. His objection is one of substance, not of form. He contends that the legislative proceedings set forth by the petition have finally determined, as between the parties, that the claim in question is valid, and that its validity cannot be averred against. This view presents the main question arising for consideration under the present state of the pleadings.

The issue joined is in part an issue of fact, and, if held to be a material issue, must be tried in the mode pointed out by the statute for the trial of issues of fact joined in original proceedings in this Court, (15 Stat., 314).

Before examining the character of the issues made, as it regards their materiality, it will be of importance to fix the construction of Section 10, Article IX, of the Constitution of this State. The language of this Section is as follows: "No scrip, certificate or other evidences of State indebtedness shall be issued except for the redemption of stocks, bonds or other evidences of indebtedness previously issued, or for such debts as are expressly authorized in the Constitution."

It is conceded that *mandamus* cannot issue in the present case to compel direct payment of the relators' demands, for want of funds in the Treasury applicable to each payment. The provision of law to which the remedy sought relates is the following: "And the State Treasurer shall, and he is hereby, required, on the presentation of the aforesaid claims, to issue to the said Phineas F. Frazee, W. E. Rose, Felix Cardarelli, or their authorized agents, upon their demand, certificates of indebtedness to the amount of their several claims, which certificates shall be redeemed by the State Treasurer out of moneys collected from the taxes for the fiscal year commencing November 1, 1874, and receivable in payment for all taxes or other dues to the State for the said fiscal year, except for the payment of the interest on the public debt or the tax levied for the support of public schools."

The first inquiry is as to whether the official acts authorized by the law quoted above are embraced within the provisions of Section 10, Article IX, of the Constitution. If such is the case, it is evident that the Constitution has imposed a limitation of some

nature upon the power of the Legislature by enumerating the cases in which that power may be rightfully exercised, and forbidding its exercise in any case other than those enumerated.

Are the certificates of indebtedness provided to be issued to the relator embraced in the terms " certificates or other evidences of State indebtedness " within the meaning of Section 10 of the Constitution? The character of the certificates of indebtedness, as intended by the statute, is very clearly fixed by its terms. They are to serve, not only as vouchers for money at the State Treasury, but as a medium of paying debts and demands due to the State, including claims for taxes. They are necessarily evidences of State indebtedness, in the ordinary acceptation of the term, being based upon an actual or supposed indebtedness of the State, and of such a character that the instrument thus issued is in itself, and without reference to any other or further proof or voucher, evidence of indebtedness, which all officers charged with the collection and receipt of taxes and other public dues are bound to accept and act upon.

Unless, then, the words " certificates or other evidences of State indebtedness," as they stand in Section 10, Article IX, of the Constitution, are to be taken in some peculiar or limited sense, the certificates of indebtedness in question must be regarded as belonging to the class to which the provision of the Constitution in question relates. The statute calls the instruments " certificates of indebtedness," and it would require very clear expressions in the statute to show that the certificates of indebtedness intended by it differed substantially from those contemplated by the Constitution. No such expressions are found in the statute, but, on the contrary, the terms fixing the character of such certificates show a clear intent to issue certificates of the character contemplated by the Constitution.

The clause of the Constitution in question must be construed, not only with regard to the particular subject and object set forth in Section 10, Article IX, but by reference to the more general subject and object to which the whole of Article IX has reference.

This Article imposes checks and limitations on the powers of the Legislature, and enforces the performance of certain Acts tending to limit the employment of the credit of the State as a means of providing revenue or postponing obligations, as it regards the ordinary expenses of the government.

Ordinary annual expenses must be met by annual taxation, and deficiencies arising in any year must be met by taxation imposed for that purpose in the next succeeding year. Money can only be borrowed for the purpose of defraying the extraordinary expenditures and upon bonds of a certain character.

Independently of the provisions of Section 10, Article IX makes it clear that the great object that controlled its enactment was the avoidance of an unnecessary creation of obligations current in the community or elsewhere, based upon the faith and credit of the State, whether forming part of a funded or floating debt. The provisions requiring that money borrowed should only be borrowed upon bonds of a character to form a funded debt shows an intention to avoid the creation of a floating debt consisting of obligations of the class referred to. They also show a clear intent that debts due for ordinary expenditures shall not be allowed to assume the form of obligations based on the faith and credit of the State, whether of the class of funded or floating debt, the requirement being positive that they shall be paid from the proceeds of taxation laid for the specified purpose of meeting deficiencies of a previous year.

These general objects give the key to the construction of Section 10. The mischief of an undue and improper issue of obligations might arise not only from the issue of that class of obligations that are connected with the permanent funded debt of the State, but from another class enumerated in Section 10, which might create a still more inconvenient floating debt. Hence it was that Section 10 was enacted, limiting the power to issue, and defining the cases in which issues might be made of scrip certificates or other evidences of debt.

Section 10 is in form a denial to the Legislature of the power of issuing evidences of debt of any class or description except in the cases provided for by that Section. No exercise of that power has validity unless its warrant lies in the permissive terms of the Section.

It is not necessary to consider at the present time whether the certificate of an officer authorized by law to audit and allow claims for services rendered, or for other like demands, falls within the description of certificates embraced within Section 10. To this class belong certificates of credit or warrants issued by the Comptroller General, and certificates and orders issued by Clerks of the respec-

tive Houses of the General Assembly for the payment of legislative expenses, and many others of a similar character. There would, however, be no difficulty in distinguishing certificates of the class just named from these, the issue of which is regulated by Section 10.

A certificate of indebtedness issued by the Treasurer cannot be regarded as belonging to the class just mentioned, but must be considered as embraced within the class to which Section 10 applies. When an account or demand payable out of the State Treasury is audited or allowed by any officer other than the Treasurer, the certificate of such officer is given as a voucher to furnish evidence to the Treasurer that the account or demand is in a condition to be paid. The duty of the Treasurer is payment. His certificates of indebtedness cannot be regarded as a step or stage to the course of the payment of demands against the State, but as a means of postponing payment of an obligation already due. When, as in the present case, the provisions of law under which such certificate is authorized are such as to impart to such certificate value enabling the holder to use it or part with it for value as a merchantable article, it must be concluded that the object of such communication of authority was to create an obligation based on the faith and credit of the State capable of having current value in the community. If the nature of the certificate is such that, in the event of currency being given to it, it could perform the functions of money, or become a common medium of trade, then the clause of the Constitution of the United States forbidding the issue by a State of bills of credit would be directly applicable to it. (State Ex Rel. Morton vs. Hoge, 4 S. C.) If such evidence of debt would, according to its nature, circulate with negotiable securities, bonds, stock of corporate companies and other merchandise, they would undoubtedly be within the class to which Section 10 relates, and be subject, as it regards their validity, to its provisions. It is clear that such an issue is a case of the employment of the credit of the State by means of obligations intended to circulate either as property in trade or money, and, as such, within the mischief that Section 10 was intended to remedy.

It must, therefore, be concluded that the right and duty of the respondent to issue the certificates of indedtedness attempted to be authorized by the law under which the relator claims, is dependent on the question whether a proper case for the issue exists under the provisions of Section 10.

The relator does not ask that the certificate should be issued for the redemption of either stock or bonds of the State; nor does he ask for such issue under the clause of Section 10 allowing such issues to take place on account of debts expressly authorized in the Constitution. The only grant of express authority to create debts conferred upon the Legislature is that of borrowing money for extraordinary expenditures upon bonds.—Article IX, Sections 7 and 14.

It is only under that clause of Section 10 that authorizes the issuing of certificates or other evidences of indebtedness for the redemption of other evidences of indebtedness previously issued, that the relator can look as conferring the authority essential to maintain his present demand.

Section 10 was very clearly intended to provide the means of converting obligations already duly created and issued into other obligations of a different form or class, such as a negotiable bond into a non-negotiable stock, or either of the last named obligations into some form of scrip or evidence of debt capable of moulding the obligation to suit the wants of the holder or the convenience of the treasury, or into obligations of the same class or general form, in order to modify some one or more of the terms or features of the original obligation, or to replace such original obligation, as in case of loss, destruction or mutilation, by one of a similar nature and tenor.

The foregoing proposition is so clearly apparent on the face of Section 10, and when comparing its contents with the Article of which it forms a part, that an extended examination of it is unnecessary. That the Section in question was intended to apply to a case of the conversion of an existing obligation into a new form is its expressly declared object. That this Section was not intended to have any secondary operation, such as authorizing original issues of obligations, or to apply to any other case than that of the conversion of a valid existing obligation into some other form of obligation, is apparent from the strong negative terms employed by it, having the effect not only to limit its own construction and operation in the manner, but to deprive the Legislature of authority to put in circulation obligations as evidences of debt, unless for the purpose directly intended by the Section, namely, the conversion of a previously existing obligation, or for the purpose of borrowing money on the issue of bonds.

It follows that no obligations can form the ground for the issue of a certificate of indebtedness under Section 10, unless it had a valid legal existence prior to, and at the time of, the adoption of the Constitution, or, if since created, it was so created under and in conformity with the provisions of the Constitution.

As Section 10 forbids the issuing of certificates or other evidences of debt, except in the redemption of previously issued certificates, it is evident that if the relators' claims are founded upon certificates of the class to which Section 10 relates, and if they were issued since the adoption of the Constitution, no authority for their issue existed under the Constitution, and they cannot be recognized as ground for the exercise of the powers authorized by Section 10. In that case it would be necessary to show that Section 10 authorized the issue of original evidences of debt upon the creation of new debt, a construction that cannot be put upon it, as we have seen.

If, on the other hand, relators' claims are based upon evidences of debt of a class different from that to which the authority conferred by Section 10 relates, then a question arises whether the authority conferred by that Section applies to them at all.

The certificates or other evidences of indebtedness for which new certificates or evidences of indebtedness may issue under this Section must be such as the Legislature could have authorized under Section 10. The terms used in this Section to describe the evidences of debt that may be issued under the authority of the Legislature are identical with the terms employed when describing the class of evidences of debt that may be converted into new issues under this Section. The primary sense of the Section is that no evidence of debt can be the subject of re-issue, unless of the same nature and character as the evidence of debt issued to replace it; nor is there ground in Section 10, or in the residue of Article IX, for modifying this result of construction. In order to meet the case made by the relator, it would be necessary to read Section 10 as if it allowed certificates or other evidences of indebtedness to be issued only whenever an indebtedness shall have previously existed. Such reading would render senseless the word "redemption," as employed in the Section, for in no sense can the issuing of an original certificate to verify the existence of a previous unevidenced debt be said to be an act of redemption. It is only for purposes of redemption that such evidences may issue, and, therefore, the construction for

which the relator is compelled to contract is inadmissible. Nor is there anything in the nature of the subject-matter to which Section 10 relates rendering such an enlarged construction proper. Viewing Section 10 as aimed at a class of evidences of debt of such a nature as to take a place in commercial dealings, and regarding it as not interfering with the ordinary course of verifying and evidencing accounts by an-auditing officer for the purpose of payment at the Treasury, it is evident that the mode of verification last named is all that is required for the convenient and orderly transaction of that class of business, and, on the other hand, that the use of a class of evidences for that purpose fitted to become the subject of commercial dealings is not only unusual and unnecessary, but of questionable propriety, as making the credit of the State and its relations to its agents and creditors a subject of constant financial speculation tending to lower the estimation of the citizen for his government to the level of that which he has for the banking house with which he deals. The construction essential to maintain the relator's claims cannot be properly placed upon the provisions of Section 10.

If the precise character and consideration of the evidence of debt held by the relator, and in respect of which he asks the issue of certificates of indebtedness, had been set forth by the pleadings, it would become a question of law whether the nature of the claims was such as to authorize the issue of a certificate of indebtedness under Section 10.

The immediate ground of his claim is a pay certificate issued by the authority of the Legislature, dated December 1, 1873. The return declares that this certificate was issued without authority of law. Under the view already taken, the test of the validity of this pay certificate of December 1, 1873, is the nature of the claim in respect to which it was issued, and the date when those claims arose, whether before or after the adoption of the Constitution. These particulars are not set forth either by the petition or by the law under which relator claims, and can only be developed upon the trial of an issue of fact.

An order directing an issue to be framed, and sent for trial to the Circuit Court, should be made.

[Then, after stating the title of the case of Frazee, he proceeded as follows:]

The conclusions at which I have arrived, as set forth in the case of the State *Ex Rel.* Rose, dispose of all the questions arising in the

present case. The relator claims certificates of indebtedness covering the amount of four bills payable or certificates issued by the State Treasurer in March, 1872, under a Joint Resolution of the General Assembly entitled "Joint Resolution to provide for the payment of certificates issued by the General Assembly," approved March 12, 1872; also the amount of certain certificates for the payment of "legislative pay certificates issued to and drawn in favor of members and attachees of the General Assembly for the year 1871–72."

Are demands of this nature sufficient to authorize the issue of certificates of indebtedness, under Section 10, Article IX, of the Constitution of this State? It may be a serious question whether the authority attempted to be conferred on the Treasurer by the Joint Resolution of March 12, 1872, which was that of borrowing money on the faith and credit of the State to an amount sufficient to cancel certain certificates made by the Clerks of the respective Houses of the General Assembly, was constitutional and valid, in view of the limitations of the Constitution allowing money to be borrowed only for extraordinary expenditures, and the fact that the object of borrowing in the case under consideration was to pay the current and ordinary expenses of the General Assembly. It may also be a serious question whether, if the authority communicated to the Treasurer was constitutional and valid, it could be exercised in the way of issuing bills payable and certificates, in view of the fact that the Constitution declares that where money is borrowed it shall be upon bonds of a certain description and subject to certain rules as to registration. But it will be unnecessary to consider these questions, since, under the conclusions at which I have arrived, as stated in the State *Ex Rel.* Rose, the case is disposed of under the view that, assuming the Treasurer to have, in all respects, conformed his action to the Joint Resolution under which he acted, still he had no authority, nor could any be conferred upon him by the Legislature, to issue certificates or other evidences of indebtedness for the borrowing of money or in exchange for accounts certified by the Clerks of the General Assembly, such issues being forbidden by Section 10, Article IX, of the Constitution.

As it regards his claim to the issue of certificates of indebtedness covering the amount of certificates for the payment of legislative expenses, the objection is that certified accounts of that character are not such certificates or evidences of indebtedness as Section 10,

Article IX, intended should authorize the issuing of scrip, certificates or other evidences of State indebtedness.

The relator's petition should be dismissed.